**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 9:18-CV-81689-ROSENBERG/REINHART**

CITYPLACE RETAIL, L.L.C.,
*a Foreign Limited Liability Company,*

      Plaintiff,

v.

WELLS FARGO BANK, N.A.,
*as Trustee for the Registered Holders*
*of Credit Suisse First Boston*
*Mortgage Securities Corp., Commercial*
*Mortgage Pass-Through Certificates,*
*series 2007-C1,*

      Defendant.

_____/

**<u>MEMORANDUM OPINION</u>**

First-year law students are required to take a basic course in contract law, and a common case for new law students to study in that course is the case of *Jacobs & Young, Inc. v. Kent*, 230 N.Y. 239 (1921). *Kent* is a memorable case involving a contract for the construction of a house. *Id.* at 240. The prospective owner of the home, Mr. Kent, wanted a very specific pipe installed as part of the construction—pipe manufactured by the Reading company. *Id.* To that end, Mr. Kent included in the contract for home construction a provision that the piping had to be Reading-brand. *See id.* Near the end of the construction of the home, however, the parties learned that, due to inadvertent error, the piping of a different manufacturer had been installed. *Id.* Mr. Kent was insistent that his house have Reading pipe and, as a result, Mr. Kent demanded specific performance—that the terms of the contract be adhered to and Reading pipe be installed. *See id.* The problem was that the piping, by that point, was ensconced in the house's walls—if the builder were to replace the piping the cost to do so would have been large indeed. *Id.* The builder,

therefore, attempted to produce evidence that the piping it had installed was the *exact same quality* as Reading pipe; the piping merely had a different name stamped on the outside of the pipe. *See id.* at 241. Not only did the trial court refuse to consider such evidence, the trial court entered a directed verdict in favor of Mr. Kent. *Id.*

On appeal, the case was reversed. In an opinion written by Justice Benjamin Cardozo, the appellate court explained that while parties are certainly free to contract as they choose, not every contract provision is strictly enforceable. Recognizing that Mr. Kent would not receive exactly what he had contracted for, Justice Cardozo acknowledged that "those who think of symmetry and logic in the development of legal rules [more than] practical adaptation to the attainment of a just result" would be troubled by the court's ruling. *Id.* at 242. Even so, New York courts had "balanced such considerations against those of equity and fairness, and found the latter to be the weightier." *Id.* at 243. Thus, when "the significance of the default is grievously out of proportion to the oppression," the contract term at issue may not be strictly enforced. *See id.*

Law students take away lessons from *Kent* in a variety of areas such as the proper quantification of damages and the suitability of specific performance, but the facts of *Kent* make the case memorable to law students for a reason. Mr. Kent no doubt felt justified in enforcing his clear and unambiguous requirement for Reading-pipe, but he lost. Cases such as *Kent* therefore establish reasonable boundaries on the freedom of parties to contract, and the remedies that may flow from certain types of breach of contract. But what are those boundaries, and what contract provisions are enforceable? Cases such as *Kent* acknowledge the reality that there can be no bright-line rule about what provisions are strictly enforceable and what are not, but when "the significance of the default is grievously out of proportion to the oppression," the contract term is generally not enforceable.

Here, the Court presided over a trial between a borrower (CityPlace) and the borrower's

lender (Wells Fargo).[1]   Just as in *Kent*, New York law governs the parties' dispute.[2]   The loan agreement between CityPlace and its lender is clear—just like the construction contract in *Kent*. CityPlace's lender made a mistake,[3] just like the builder in *Kent*.   And just like Mr. Kent, CityPlace insisted on enforcing its contract as it was written.   The problem, however, is that the contract provision at issue in this case (requiring the disclosure of the name of an appraiser working for the lender) is a provision of minimal significance which is analogous to the miniscule difference between a Reading-brand pipe and the pipe in Mr. Kent's walls.

The Court details in this Memorandum Opinion the specifics of the mistake committed by CityPlace's lender, what the contract provision at issue is, and why the provision has minimal significance; but CityPlace, in seeking to strictly enforce the provision, would transform the lender's small mistake into a multi-million dollar forfeiture.   Just as in *Kent*, New York law does not permit CityPlace to strictly enforce its contract under these circumstances.   For the reasons set forth below, judgment is entered against CityPlace.

### I.      PROCEDURAL HISTORY OF THE CASE

This action concerns a dispute under a mortgage loan agreement between a lender, defendant Wells Fargo Bank, N.A., as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp. Commercial Mortgage Pass-Through Certificates, Series 2007-C1 (the "Trustee"), and a borrower, plaintiff CityPlace Retail, LLC ("CityPlace"), regarding compliance with provisions in a loan agreement governing the amount to be paid on a loan.   More specifically, the parties dispute how the loan should have been refinanced including: (1) the amount necessary to pay off and refinance the loan, (2) which party properly obtained an appraisal

---

[1] As explained below, Wells Fargo's role in this case is that of a trustee.
[2] The parties are in agreement that New York law applies in this case.
[3] The mistake in this case originated with the lender's servicer.

of the property, and (3) whether there should be any additional appraisals of the property in connection with the refinance.

On December 7, 2018, CityPlace filed this action in Florida Circuit Court.  On December 11, 2018, the Trustee removed the action to the United States District Court for the Southern District of Florida.  Dkt. 1.  CityPlace and the Trustee have filed cross-claims against each other for declaratory relief.  CityPlace is seeking a declaration as to the following:

> (1) Defendant/Lender's CBRE[4] appraisal dated November 23, 2018, is invalid in whole and/or in part because it improperly included the potential future value of a zoning change in violation of the requirements set forth in Section 4.9(g)(v) of the Loan Modification;
>
> (2) the Net Refinance Proceeds be calculated in accordance with the appraisal submitted by Plaintiff/Borrower's appointed appraiser Cushman & Wakefield; and
>
> (3) to the extent the requirement for a third-party Qualified Appraiser is determined to have been triggered, the third- party Qualified Appraiser must base its appraisal on the "as-is" value of the Property on or before October 24, 2018.

Dkt. 49 at ¶¶ 26-38.

The Trustee seeks a declaratory judgment that:

> (i) the Trustee has complied in all respects with its obligations under the parties' loan agreements;
>
> (ii) CityPlace must direct its Qualified Appraiser to prepare a new appraisal based on all information that was available to CityPlace in September 2018 with respect to a zoning change for the use of the portion of the property that Macy's had occupied;
>
> (iii) CityPlace is obligated to cooperate and to participate in the appointment of a third party Qualified Appraiser in accordance with the terms of Section 4.9(g);
>
> (iv) upon the completion of the third party's Qualified Appraiser's Appraisal, the parties are obligated to determine the Appraised Value in accordance with the formula set forth in Section 4.9(g) of the Loan Modification Agreement;

---

[4] CBRE stands for Coldwell Banker Richard Ellis.

(v) upon determination of the Appraised Value, the parties are obligated to cooperate and to determine the Net Refinancing Proceeds in accordance with the formula set forth in Section 4.9(f) of the Loan Modification Agreement; and

(vi) upon determination of the Net Refinancing Proceeds, CityPlace is obligated to pay the Trustee the remaining balance of the Net Refinancing Proceeds that it did not pay to the Trustee when the refinancing occurred and the loan was partially paid on December 21, 2018.

Dkt. 50 at ¶¶ 71-83.

On December 13, 2018, CityPlace filed an Emergency Motion for Preliminary Mandatory Injunctive Relief before this Court, seeking to compel the Trustee to refinance its loan under the terms set by CityPlace.  Dkt. 14.  On December 18, 2018, this Court entered a consent order that resolved the Emergency Motion (the "Consent Order").  Dkt. 26.  Under the Consent Order, the parties agreed that the closing of the refinance would occur on December 26, 2018, and that the parties would use CityPlace's appraisal to determine the appraised value of the property on a preliminary basis, provided that the parties reserved their respective rights with respect to their loan agreement and the ultimate calculation of the appropriate amounts for refinancing.  *Id.* at 2.

After discovery, Plaintiff filed a motion for summary judgment.  The Court denied the motion (hereinafter cited as the Court's "Decision").  This case was tried before the Court in a bench trial held on October 23, 24, 30, 31 of 2019, and January 13, 14, 16, and 17 of 2020.  Dkt. 193-194, 195, 203-206.  At trial, CityPlace presented the live testimony of Jordan Rathlev, James Walsh, Stuart Lieberman and its expert Val K. Chiasson in its case in chief.  In addition, CityPlace submitted deposition testimony from Lorena Trujillo, Christie Corallo, Kristie Alvelo, Geraldine Kohut, Gary Routzhan, Aaron Bryson (a representative of DW Partners, a noteholder of the Trust) and Patti Unti Healy (a representative of Waterfall Asset Management, another noteholder of the Trust).  Dkt. 178.

The Trustee presented the live testimony of Ms. Alvelo, Ms. Kohut, Ms. Corallo, Mr. Lieberman, Gregory Becker, Armando Fana (the Director of the Department of Housing and Community Development for the City of West Palm Beach), Gopal Rajegowda of CityPlace, Corinne Penksa of Related[5] and its expert, Ted Whitmer.   In addition, the Trustee submitted deposition testimony from Ms. Trujillo, Mr. Rathlev, Mr. Rajegowda, Ms. Penksa and Teresa Engedal.

## II.     FINDINGS OF FACT

The Court first summarizes its finding of fact in narrative form.  After the Court's summary, the Court lists its findings of fact in detailed, numerical form.  Although all of the Court's findings of fact support the Court's conclusions of law, the findings of fact that are of particular significance to the Court's decision are **bolded and underlined**.

### *Narrative Summary of the Court's Findings of Fact*

In 2018, CityPlace was presented with an opportunity—an opportunity it decided to take. If CityPlace could pay off its existing mortgage using a *lower* property valuation, CityPlace would not have to pay certain amounts of money to its debtholders.   Relatedly, if CityPlace could refinance with a new lender using a *higher* property valuation, CityPlace could obtain favorable loan terms.  Thus, CityPlace needed two different numbers, or at least two different perspectives on the value of its property.  An important development enabled CityPlace to take advantage of this opportunity.  In 2018, CityPlace had a pending zoning change application[6] for a portion of its property containing a Macy's department store.  That zoning change application had the potential to greatly increase the value of the CityPlace property by transforming the financially troubled Macy's site into a more profitable, higher-density residential tower complex.  If CityPlace could

---

[5] Related refers to the Related Companies LLC.
[6] For the sake of simplicity, the Court refers to the application pending before the local government as a zoning change application.

get an appraisal for its mortgage payoff that did *not* attribute any value to the pending zoning change application (a lower number), but locate a lender that *would* fund a loan with consideration towards the CityPlace property's future, CityPlace would stand to reap a significant benefit. That is what CityPlace did. CityPlace created marketing materials that showed its Macy's site as a residential tower and shopped for refinancing lenders using that premise. With regard to its existing loan that needed to be paid off, CityPlace needed to get an appraisal, knowing that the Trustee was entitled to get a counter-appraisal. For its own appraisal, CityPlace did not provide information to its appraiser about the zoning change application and the Macy's site, as that information could increase the property's appraised value.[7] CityPlace similarly did not provide this information to the Trustee and the Trustee's appraiser.[8]

CityPlace was successful in the early stages of its efforts to favorably refinance its property—it obtained an appraisal that essentially assigned no additional value to the Macy's site and it obtained the appraisal before its zoning change application was approved by government authorities. Additionally, CityPlace's zoning change application was ultimately approved *prior* to the deadline for CityPlace to refinance, which meant that its new lender could easily consider the zoning change in its decision to fund a new loan. Both of these events were very favorable to CityPlace; the only unknown variable was that CityPlace did not know what value the Trustee's counter-appraisal would assign to the property—that is, would it be significantly higher than the

---

[7] The CityPlace representatives testified at trial that they believed, in good faith, that the payoff appraiser—Mr. Walsh—did not need to be informed of the pending zoning change application and that this was the reason they did not disclose information of the same. The Court does not find it reasonable to withhold this information from its appraiser for the consideration he deemed appropriate and consistent with appraisal standards and thus does not credit the testimony of the CityPlace representatives as to why they withheld this information.

[8] The Trustee's appraiser, Mr. Lieberman, sought to obtain information about the Macy's site during his preparation of a related appraisal (the TIF appraisal) shortly before the refinancing events in this case—he received no information of note in response. CityPlace's position, at trial, was that it *did* disclose the Macy's zoning change by providing voluminous documents describing (on a single page) a possible future use of the Macy's site. The zoning change application was an event of sufficient magnitude that an appraiser would reasonably expect to be explicitly informed of it (a universal opinion of the appraisers at trial). The Court finds that specific, concrete information about the application should have been disclosed by CityPlace to its appraiser for the consideration he deemed appropriate and consistent with appraisal standards.

CityPlace number?  If the counter-appraisal value was too high, CityPlace could be required to pay a significant sum to its debtholders to refinance its loan.

Fortune bestowed upon CityPlace an opportunity when the servicer for CityPlace's loan, Berkadia, made a mistake by not formally informing CityPlace of the identity of the Trustee's counter-appraiser by the necessary deadline.  Under the terms of CityPlace's loan agreement, the failure to formally identify an appraiser could carry with it a penalty that could ensure CityPlace's refinancing resulted in the maximum possible benefit to CityPlace; the penalty was that CityPlace's appraisal could control the entire refinancing process.  With such a possible outcome, CityPlace would no longer need to worry that the Trustee's counter-appraisal would be too high, or that the counter-appraiser would learn about the zoning change application and assign value to the application.  Instead, if CityPlace strictly enforced the loan agreement as it was written, CityPlace's refinancing appraisal would govern the outcome.  This is the path that CityPlace chose, and the reason the parties are before this Court.

### The Parties

1.      CityPlace, the Plaintiff, is a Delaware Limited Liability Company authorized to conduct business in the State of Florida.  Dkt. 164 at 11-12.

2.      The Trustee, the Defendant, is chartered and its main office is located in Sioux Falls, South Dakota.  Dkt 164 at 12.

### The Loan and the 2011 Loan Modification Agreement

3.      On October 6, 2006, Column Financial, Inc. (the "Initial Lender") advanced CityPlace a loan in the principal amount of $140,000,000 (the "Loan").  Dx27 at 6-114.

4.      At all relevant times the Loan has been secured by a mortgage on the real property commonly known as "CityPlace" (the "Property").  Dkt. 164 at 12.

5.      CityPlace and the Initial Lender entered into the Amended and Restated Loan Agreement, dated February 27, 2007 (the "Loan Agreement"), that resulted in restructuring the Loan and increasing the principal amount from $140,000,000 to $150,000,000.  *Id.*; Dx1.

6.      Prior to December 11, 2011, the Initial Lender assigned all rights in the Loan to CMSC 2007-C1 South Rosemary, LLC ("CSMC 2007 C-1"), and the Loan was made part of a securitized pool of loans.  The Trustee has served as the Trustee for the commercial mortgage backed securities trust that owns the securitized pool of loans.  Dkt. 164 at 12.

7.      CityPlace and CSMC 2007 C-1 entered into the Amended and Restated Fee, Leasehold and Condominium Mortgage and Security Agreement Modification Agreement, dated as of December 11, 2011 ("Amended Security Agreement").  Px4.  Among other things, the Amended Security Agreement acknowledged CityPlace's default on the Loan, restated the amounts due and owing under the Loan and bifurcated the Loan into two separate tranches: (a) Tranche A in the principal amount of $100,000,000, and (b) Tranche B in the principal amount of $50,000,000 and payable in accordance with the Loan Modification Agreement dated December 11, 2011 (the "Loan Modification Agreement").  *Id.* at 1, 8.

8.      The Loan Modification Agreement sets forth the procedure to determine the Net Refinancing Proceeds that CityPlace would pay the Lender (*i.e.*, the Trustee) upon any refinancing of the Loan.  Dx2 at 15-17.

9.      During 2016, CityPlace defaulted under the Loan.  Consequently, CityPlace and the Trustee entered into a Loan Reinstatement and Modification Agreement, dated June 21, 2017, that, among other things, reinstated the Loan, withdrew the Lender's acceleration of the maturity date and acknowledged the indebtedness and interest owed to the Trustee.  Dx3.

10.      The four agreements relating to the Loan are collectively referred to as the "Loan Agreements".

11.      The Macy's portion of the Property was part of the collateral for the Loan, and was subject to a lease that was acquired by an affiliate of CityPlace, which (like CityPlace) was wholly controlled by Related.  10/23 Tr. at 180:23-181:14.  The affiliate acquired that lease without obtaining the Trustee's consent, as was required under the Loan Documents, and the Trustee reserved all rights with respect to the unauthorized assignment of the lease to the affiliate as opposed to CityPlace itself.  Px7 at 12-13.

12.      During the time that CityPlace was in default, C-III Asset Management, LLC ("C-III") serviced the Loan.  1/14 Tr. at 141:13-22.

13.      On September 22, 2017, because the Loan was no longer in default, William N. Hales II of Berkadia Commercial Mortgage LLC ("Berkadia"), notified CityPlace that the Loan had been transferred back to Berkadia and that Berkadia was responsible for servicing the Loan.

Dx22.  CityPlace understood that Berkadia replaced C-III in all respects and that Berkadia would thereafter be acting on behalf of the Trustee to administer and enforce the Loan and the Loan Agreements.  10/23 Tr. at 55:22-56:2.

14.     After September 22, 2017, CityPlace dealt directly with Berkadia representatives concerning servicing of the Loan.  *Id.* at 157, 19-23.

### *The Relevant Provisions of the Loan Modification Agreement*

15.     Section 4.1 of the Loan Modification Agreement set a Fixed Maturity Date for the Loan of December 11, 2018.  Dx2 at 8.

16.     Section 4.9(c)(i) of the Loan Modification Agreement sets forth the waterfall for determining the distribution of Net Financing Proceeds at the time of a closing on a refinance or repayment of the Loan.  Dx2 at 14.

17.     Section 4.9(f) of the Loan Modification Agreement defines Net Refinancing Proceeds as follows:

> For purposes of this Agreement, in the event of a Refinance, "Net Refinancing Proceeds" shall equal the Appraised Value (as hereinafter defined) minus an amount not to exceed seven percent (7%) of the Appraised Value (such amount deducted from the Appraised Value in order to calculate New Refinancing Proceeds, the "Refinancing Deduction Amount"); provided so long as no Event of Default under the Loan Documents has occurred and is then continuing, if the Net Refinancing Proceeds are less than the amount necessary to pay the Indebtedness in full, Borrower shall nevertheless be obligated to pay all accrued and unpaid interest, principal, and other amounts due under Tranche A in full and any accrued and unpaid interest, principal and other amounts due under Tranche B that is unpaid from the Net Refinancing Proceeds shall be waived by Lender (and Lender shall release and/or assign the Loan Documents of record providing in Section 6.18 below)."

Dx2 at 15-16.

18.     In the event of a refinancing or repayment of the Loan, Section 4.9(g) of the Loan Modification Agreement sets forth the procedure to determine the Net Refinance Proceeds.  Dx2 at 16-17; 1/14 Tr. at 149:16-151:16.

19.     The amount owed by CityPlace to the Trustee at the closing of a Refinance depends, in part, on the determination of the Property's Appraised Value. Dx2 at 15-16; 1/14 Tr. at 151:3-21.

20.     There is no provision in the Loan Modification Agreement regarding the latest "as of" date that could be used for the Property's "Appraised Value."  That "as of" date had to occur only before the December 11, 2018 maturity date.  Dx2 at 16-17.

21.     Under Section 4.9(g), the Property's "Appraised Value" is defined as "the fair market value, as of a date not earlier than sixty (60) days prior to the closing of the New Loan." Dx2 at 16.

22.     Section 4.9(g)(i) of the Loan Modification Agreement states:

> Within ten (10) Business Days after Lender's receipt of Borrower's written notice of an intended Refinance, Lender shall appoint a Qualified Appraiser (as defined below), and Borrower shall appoint a second Qualified Appraiser. Each party shall notify the other of the identity of its Qualified Appraiser so engaged within fifteen (15) Business Days after receipt of the notice regarding the intended Refinance. If either Party fails to receive the notice of the identity of the other Party's Qualified Appraiser, such Party shall notify the other Party of such failure within twenty (20) Business Days after receipt of the notice regarding the intended Refinance.

Dx2 at 16.

23.     Under Section 4.9(g)(iv) of the Loan Modification Agreement, "[i]f either Lender or Borrower does not appoint a Qualified Appraiser within the required time period, the MAI Appraisal obtained by Lender or Borrower, as the case may be, shall be the only MAI Appraisal used to calculate the Net Refinancing Proceeds.  In such case, the determination so made shall be conclusive and binding on Borrower and Lender."  Dx2 at 16.

24.     Under Section 4.9(g)(ii) of the Loan Modification Agreement, each Appraiser is to deliver an MAI Appraisal within 30 days after having been engaged.  Dx2 at 16.

25.     Under Section 4.9(g)(ii) of the Loan Modification Agreement, "[a]ll requests for information related to any MAI Appraisal being obtained shall be submitted in writing to Borrower, and Borrower shall use reasonable efforts to respond with the requested information within five (5) Business Days following receipt of such request."  Dx2 at 16.

26.     Section 4.9(g)(iii) of the Loan Modification Agreement states as follows:

> If the two MAI Appraisals vary by less than five percent (5%), the Appraised Value shall be the average of the two. If the appraisals vary by more than five percent (5%), then the two MAI Appraisers shall choose another Qualified Appraiser, which Qualified Appraiser shall render its MAI Appraisal. If the two Qualified Appraisers first selected fail to agree upon a third Qualified

Appraiser within ten (10) days after their appointment, the third Qualified Appraiser shall be selected by the then president of the chapter of the Appraisal Institute in the State in which the Property is located (or any successor association if the Appraisal Institute is no longer in existence) at the request of Lender and Borrower. All appraisers selected hereunder must be Qualified Appraisers. If a third MAI Appraisal is thus obtained, the Appraised Value shall be the average of the two MAI Appraisals closest in value unless all three MAI Appraisals are equidistant from each other in value in which event the Appraised Value shall be the average of all three MAI Appraisals.

Dx2 at 16.

27.  "Qualified Appraiser" under the Loan Modification Agreement "shall mean a nationally recognized independent commercial real estate appraiser that is certified or licensed in the State (if such State provides for certification or licensing), having at least ten (10) years' experience in the appraisal of similar properties in the geographic area in which the Property is located." Dx2 at 17.

28.  Section 4.9(g)(v) of the Loan Modification Agreement defines an "MAI Appraisal" to mean "an appraisal of the Property performed in accordance with the Uniform Standards of the Professional Appraisal Practice ['USPAP'], [which] shall meet the minimum appraisal standards for national banks promulgated by the Comptroller of the Currency pursuant to Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ['FIRREA']." Dx2 at 17.

### The Refinance

29.  In June 2018, Jordan Rathlev who is both the Vice President of Development for the Related Companies LLC ("Related"), the ultimate parent of CityPlace, and a Vice President of CityPlace, contacted Christie Corallo of Berkadia to request consent to permit the imposition of a TIF Assessment on the Property in connection with the issuance of bonds by the CityPlace Community Development District (the "TIF Assessment").  10/23 Tr. at 32:1-8; Dx38 at 11. Because the TIF Assessment would constitute a Lien on the Property (as defined in the Amended and Restated Loan Agreement dated February 27, 2007) and would not be a Permitted Encumbrance on the Property, CityPlace needed to obtain consent from both Berkadia and the Special Servicer to entitle CityPlace to proceed with the TIF Assessment.  1/14 Tr. at 37:2-9.

30.     Berkadia advised CityPlace that Berkadia had to obtain an appraisal of the Property in order to determine the impact of the TIF Assessment on the Property's value before consent to the TIF Assessment could be given.  *Id.* at 37:17-38:4.

31.     In connection with his on-going communications with Berkadia, on August 3, 2018, Mr. Rathlev asked Berkadia's attorney, Lorena Trujillo, if the same appraisal to be prepared in connection with the TIF Assessment could also be used as the Lender's appraisal for a potential refinance under the Loan Modification Agreement.  Dx52 at 5-6.

32.     After conferring with the Special Servicer, Ms. Trujillo advised Mr. Rathlev that the TIF Assessment appraisal could not be used to satisfy the appraisal requirement in connection with the potential refinancing.  Such an appraisal would not have satisfied the 60 day requirement in Section 4.9(g) of the Loan Modification Agreements (*i.e.*, be an "as of" date of October 12, 2015 or later).  Dx52 at 3-4; 1/14 Tr. at 47:14-49:10; 1/13 Tr. at 134:20-135:22.

### The Appointment of Cushman & Wakefield

33.     In mid-August 2018, before CityPlace triggered the process under Section 4.9(g) of the Loan Modification Agreement, Mr. Rathlev called James Walsh of Cushman & Wakefield and asked Mr. Walsh to be CityPlace's appraiser for the refinancing.  10/23 Tr. at 92:5-20; 10/30 Tr. at 12:9-13.  Thereafter, on August 23, 2018, Mr. Walsh sent Mr. Rathlev an initial draft of the engagement letter to conduct an appraisal of the Property in connection with CityPlace's refinancing of the Loan.  Dx92.  At Mr. Rathlev's request, Mr. Walsh revised the engagement letter, and he sent a new draft to Mr. Rathlev on September 10, 2018.  Dx93.

34.     On September 7, 2018, Mr. Rathlev emailed a copy of a letter dated that same date addressed to the Trustee (the "Notice of Refinance") to Kristie Alvelo, a Vice President in Berkadia's special request department, and Ms. Trujillo, Berkadia's attorney.  Dx87.  CityPlace also sent the Notice of Refinance to the Trustee by Federal Express. 10/23 Tr. at 169:8-12.  The Federal Express containing the Notice of Refinance was received by the Trustee on September 10, 2018.  1/13 Tr. at 91:1-17.  The Notice of Refinance advised the Trustee and Berkadia of CityPlace's intent to refinance the Loan and also threatened legal action if the Trustee failed to consent to the TIF Assessment.  Dx87 at 5.  Later on September 7, 2018, Ms. Trujillo sent Mr. Rathlev an email confirming receipt of the Notice of Refinance.  Dx86.

35.     The Notice of Refinance triggered the valuation procedure set forth in Section 4.9(g) of the Loan Modification Agreement.  *See* Dx2 at 16.

36.     On September 10, 2018, CityPlace sent the Trustee and Berkadia a letter stating that CityPlace had appointed Cushman & Wakefield as its Qualified Appraiser under Section 4.9(g)(i) of the Loan Modification Agreement.  Dx98.

### The Appointment of CBRE

37.     Beginning in the Spring of 2016, the Trustee (through C-III and Berkadia) began using Stuart Lieberman of CBRE as the Trustee's appraiser for the Property.  10/24 Tr. at 21:9-21. That relationship was a continuous one through the end of 2018.  1/14 Tr. at 31:19-34:5; 10/24 Tr. at 21:9-25:17.

38.     In 2016, Mr. Lieberman performed two appraisals of the property for C-III, the Loan's then special servicer.  10/24 Tr. at 21:10-22:24.  Mr. Lieberman appraised the Property again in 2017.  *Id.* at 139:24-140:6.[9]  Mr. Lieberman viewed himself as the Trustee's appraiser of the Property for all purposes.  *Id.* at 36:25-37:5.  Mr. Lieberman viewed himself as "having been designated Berkadia's appraiser for any valuation that Berkadia needs or desires in [its] role as servicer, for the Property."  *Id.* at 36:25-37:7.

39.     At the time that CityPlace sent its Notice of Refinance, Mr. Lieberman had already been in contact with Mr. Rathlev and Ms. Penksa of CityPlace in connection with preparing an appraisal for the Property with respect to the TIF Assessment.  1/14 Tr. at 34:19-35:3; 10/24 Tr. at 49:9-24.

40.     Berkadia "often engage[s] CBRE for various matters," including appraisal and opinions of value.  1/14 Tr. at 31:1-11.  On behalf of the Trustee, Berkadia chose to engage Mr. Lieberman for several reasons.  First, Berkadia considered Mr. Lieberman's experience appraising the Property.  *Id.* at 32:14-18.  Berkadia typically hires the same appraiser to appraise a property, as it is a "best practice" to ensure continuity in valuation.  *Id.* at 33:4-10.

41.     Berkadia also considered the complex nature of the Property—a mixed use property in West Palm Beach—and decided to hire Mr. Lieberman because of his familiarity appraising this unique Property.  1/14 Tr. at 34:1-5.  Mr. Lieberman was Berkadia's "appraiser of choice," and Berkadia never considered hiring a different appraiser.  *Id.* at 34:12-15.  When Berkadia received

---

[9]  Mr. Lieberman began dealing with CityPlace representatives on a regular basis in 2016 and going forward.  10/24 Tr. at 21:9-25:17; Dx19; Dx20; Dx21; Dx74; Dx106.  Mr. Lieberman had dealings with Teresa Engedal, Corinne Penksa, Gopal Rajegowda and Jordan Rathlev.  10/24 Tr. at 49:9-18; 1/15 Tr. at 181:3-25; 1/15 Tr. at 180:25-181:7; Engedal Dep. Tr. at 71:3-9; Dx19, Dx20.  The email correspondence revealed that Mr. Rathlev and Mr. Lieberman began working with each other in April 2016.  10/23 Tr. at 176:16-23; Dx19; Dx20.

the Notice of Intent to Refinance from CityPlace, Ms. Alvelo decided to have Mr. Lieberman prepare an updated appraisal in connection with the refinance. *Id.* at 34:19-35:7.

42.     Berkadia had already appointed Mr. Lieberman as the Trustee's appraiser for the Property for all purposes. 1/14 Tr. at 112:6-8. By the time CityPlace sent the Notice of Intent to Refinance, Mr. Lieberman had already been engaged as Berkadia's appraiser. 1/14 Tr. at 34:21-35:7. Ms. Alvelo testified that she never considered hiring any other appraiser to appraise the Property. *Id.* 34:16-18.

43.     Neither Berkadia nor Mr. Lieberman needed an executed copy of the engagement letter before Mr. Lieberman began working on the appraisal. 1/14 Tr. at 77:15-21. Given Berkadia's relationship with CBRE, Mr. Lieberman viewed execution of an engagement letter to be "merely [an] administrative requirement by CBRE." 10/24 Tr. at 141:10-142:3. In fact, once Berkadia asked Mr. Lieberman to prepare an appraisal of the Property, he immediately began working on the appraisal. *Id.* at 140-50. Mr. Lieberman's only requirement was that he receive a signed engagement letter before he delivered his appraisal report. *Id.* at ¶ 7. Berkadia does not have a policy requiring that an engagement letter be signed before an appraiser may begin working on an appraisal. 1/14 Tr. at 39:14-17. Berkadia will give an assignment to an appraiser without an engagement letter, and Berkadia expects the appraiser to begin working upon receipt of the assignment. *Id.* at 39:14-24.

### The Trustee's Notice to CityPlace Regarding Appointment of CBRE

44.     Under Section 4.9 (g)(i) of the Loan Modification Agreement, the Trustee was to send CityPlace formal written notice of the appointment of Mr. Lieberman by September 28, 2018, or 15 business days from receipt of the Notice of Refinance, which occurred on September 7, 2018. 1/14 Tr. at 167:9-18.

45.     The Trustee, however, did not provide CityPlace with formal written notice of the appointment of its Qualified Appraiser for the refinance before September 28, 2018. 1/14 Tr. at 75:10-17. The first writing from the Trustee disclosing CBRE was a letter dated October 11, 2018 from Berkadia. *Id.* at 75:16-17; Dx164.

46.     The Trustee's failure to provide formal written notice of the appointment of its Qualified Appraiser was the result of a mistake by Berkadia. 1/14 Tr. at 230:10-231:10; 1/14 Tr. at 94:2-13; 1/13 Tr. at 71:22-72:25. Representatives of Berkadia had failed to input the Notice of Refinance into Berkadia's internal assignment system until September 24, 2018. *Id.* at 162:4-14.

47.     From June 2018 through September 2018, Ms. Alvelo was assigned to handle CityPlace's request to obtain consent to proceed with the TIF Assessment.  1/14 Tr. at 25:14-20.

48.     As part of her work on CityPlace's request, Ms. Alvelo worked with Mr. Lieberman in connection with Mr. Lieberman's most recent assignment to prepare an appraisal to assess the impact that a TIF assessment would have on the value of the Property.  1/14 Tr. at 32:8-33:21.

49.     On September 7, 2018, while Ms. Alvelo was working on the TIF assessment, she received a copy of CityPlace's Notice of Refinance.  1/14 Tr. at 50:24-51:18; Dx87.  Ms. Alvelo forwarded the notice to Christie Corallo, the client relations manager for CityPlace.  *Id.* at 23-25.

50.     Ms. Corallo was responsible for handling special requests made by CityPlace with respect to the Loan and inputting those requests into the Berkadia internal assignment system, so that such requests could be assigned to a member of the Berkadia servicing team.  1/13 Tr. at 68:22-69:8; 1/14 Tr. at 162:15-163:4.

51.     Ms. Corallo, however, initially failed to input CityPlace's Notice of Refinance in the system because she did not recognize that the September 7 letter was a Notice of Refinance. 1/13 Tr. at 30:15-24, 32:8-11; 1/14 Tr. at 163:14-18.  Ms. Corallo believed the letter related to the TIF Assessment.  1/13 Tr. at 30:15-24; 1/14 Tr. at 163:14-18.

52.     On September 24, 2018, Ms. Alvelo contacted Ms. Corallo to inquire about the status of the Notice of Refinance as a result of the Special Servicer contacting Ms. Alvelo to inquire about the status of the refinance.  1/14 Tr. at 53:11-55:6.

53.     After speaking with Ms. Alvelo, Ms. Corallo immediately input the Notice of Refinance into Berkadia's system, and the matter was assigned to Geraldine Kohut, a Berkadia Vice President for underwriting, on September 24, 2018.  *Id.* at 162:8-14.

54.     At the time that Ms. Kohut was assigned to handle the Notice of Refinance, communications concerning the TIF Assessment were simultaneously occurring, and Ms. Kohut was under the belief that the deadlines for written notice of appointment of a Qualified Appraiser had yet not been triggered.  1/13 Tr. at 133:19-23; 1/14 Tr. at 195:5-20.

55.     Ms. Alvelo advised Ms. Kohut that Berkadia would use Mr. Lieberman to provide an appraisal in connection with the refinance.  1/14 Tr. at 70:19-71:5.  On September 25, 2018, Ms. Kohut sent an email to Ms. Alvelo stating that Berkadia would need to acquire an "updated appraisal" in order to determine the Net Refinancing Proceeds.  1/14 Tr. at 198:13-199:1; Dx120. When Ms. Kohut sent this email, she understood that CBRE would prepare the updated appraisal.

*Id.* at 199:16-20.  Ms. Kohut never believed that any firm other than CBRE would provide the updated appraisal.  *Id*. at 199:21-25.

56.     On October, 5, 2018, Ms. Kohut sent an email to Ms. Alvelo and Mr. Bryson, in which she stated, "It is clear we need to get a new appraisal for the purpose of the capital event other than CBRE."  1/14 Tr. at 206:23-207:7; Dx143.  *Id.*  When Ms. Kohut sent her October 5, 2018 email, she had no intention of replacing CBRE as the appraiser for the capital event and had no intention of hiring any other appraiser to update the CBRE appraisal.  *Id*. at 208: 9-17.  Rather, Ms. Kohut "knew we [Berkadia] were going to have to get an updated appraisal from CBRE."  *Id.* at 206:8-20.

57.     On October 5, 2018, Ms. Kohut sent Mr. Rathlev a requirements letter requesting information related to the refinance.  Dx140.  In her October 5, 2018 letter, Ms. Kohut did not make any reference to the appointment of Mr. Lieberman and CBRE.  *Id.*  She stated in the letter that Berkadia would appoint an appraiser once Berkadia received a countersigned copy of the letter.  *Id.*

58.     On August 18, 2018, Mr. Rathlev also emailed Ken Himmel, the CEO of the Related Companies and Mr.  Rajagowda to discuss the status of the Refinance. 10/23 Tr. at 215:15-216:18; Dx67.  Mr. Rathlev proposed that CityPlace use Cushman & Wakefield as its appraiser and the Trustee most likely would be using CBRE as its appraiser.  *Id.*  Mr. Rathlev recognized that it "would make sense" for the Trustee to use CBRE as its appraiser for the Refinance given that CBRE was the Trustee's appraiser for the TIF Assessment.  10/23 Tr. at 258:8-16.

59.     A few days prior to sending his August 18, 2018 email to Mr. Kimmel and Mr. Rajegowda, Mr. Rathlev received three separate emails from Kristie Alvelo, Lorena Trujillo and Stuart Lieberman, each informing him that Mr. Lieberman would be performing an appraisal of the Property for purposes of the TIF Assessment.  10/23 Tr. at 215:15-21.

60.     Based upon the Court's review of the totality of evidence at trial, the Court finds that CityPlace had knowledge that Mr. Lieberman was the Trustee's Qualified Appraiser of the Property with respect to the refinance as a result of communications between the parties and CityPlace's prior dealings with Mr. Lieberman; the Court's finding is based upon reasonable inferences from the evidence—evidence that CityPlace knew that Mr. Lieberman would be chosen for the refinancing appraisal.  *See* Dx58; Dx67; 10/23 Tr. at 215:15-216:18.

*CityPlace's Termination of the Appraisal Process*

61.     On October 8, 2018, CityPlace responded to Ms. Kohut's October 5, 2018 letter. Dx147.  CityPlace stated that the Trustee had failed to appoint a Qualified Appraiser within the time period required by Section 4.9(g)(i) of the Loan Modification Agreement and CityPlace's appraisal therefore would be the only appraisal utilized for determining the Appraised Value for purposes of ascertaining the Net Refinancing Proceeds at the closing of the refinance.  *Id.*

62.     On October 9, 2018, Ms. Kohut was removed from her assignment with respect to the refinance and Ms. Alvelo was assigned to the refinance because she was already working on the TIF Assessment and was more experienced with respect to these types of matters, especially since a dispute had arisen.  1/14 Tr. at 71:6-72:4, 72:19-21, 102:22-25.

63.     On October 11, 2018, Gary Routzahn, a Senior Vice President at Berkadia who supervised the Berkadia servicing group, responded to CityPlace's October 8, 2018 letter.  Dx168. Mr. Routzahn's October 11 letter, which was prepared by Berkadia's counsel, disputed CityPlace's contention that a Qualified Appraiser had not been appointed and asserted that CityPlace was aware that CBRE was the Trustee's Qualified Appraiser.  *Id.*; 1/14 Tr. at 73:13-14.

64.     On October 14, 2018, CityPlace provided the Trustee with a copy of an appraisal report prepared by Mr. Walsh (the "Cushman Appraisal").  10/23 Tr. at 103:23-104:3.

65.     On October 24, 2018, CityPlace sent the Trustee a letter reiterating its position that the Cushman Appraisal was binding because the Trustee had failed to timely appoint a Qualified Appraiser and that Ms. Kohut's October 5, 2018 email supported this contention.  Dx179. CityPlace acknowledged that CBRE was conducting appraisals for the CityPlace Property, but insisted that CBRE was the appraiser only for the TIF.  *Id.*

66.     On November 1, 2018, Berkadia's Kristie Alvelo responded to CityPlace's October 24 letter.  Dx187.  She stated that the Trustee rejected the contention that it had failed to appoint an appraiser under Section 4.9(g) of the Loan Modification Agreement.  *Id.*  Berkadia then urged CityPlace to cease undermining the appraisal process set forth in Section 4.9 and to allow the appraisal process for the refinance to proceed.  *Id.*  CityPlace declined to do so.

67.     On November 7, 2018, CityPlace responded to Berkadia's November 1 letter, again setting forth CityPlace's position regarding the Trustee's alleged failure to appoint CBRE for the Refinance. Dx194. CityPlace further advised that it intended to proceed with the Refinance using only its own appraisal that had been delivered to Berkadia on October 12, 2018.  *Id.*  The letter

claimed that Berkadia's efforts to continue with the Section 4.9(g) process obstructed CityPlace's refinancing efforts. *Id.*

68.     On November 14, 2018, CityPlace wrote to the Trustee.  CityPlace advised the Trustee that it was closing on the Refinance on December 11, 2018 and made certain demands of the Trustee in connection with the Refinance, including a request for delivery of a payoff notice. **The Trustee's delay in providing formal written notice of its Qualified Appraiser under Section 4.9(g) of the Loan Modification Agreement did not cause any injury to CityPlace or otherwise prejudice CityPlace.  CityPlace presented no evidence showing that it was harmed by the Trustee's delay**.[10]  Under cross-examination, Jordan Rathlev testified that CityPlace was harmed in two ways: (1) CityPlace incurred legal fees in bringing the instant lawsuit, and (2) by completing the appraisal after the Commission approved CityPlace's rezoning application, Mr. Lieberman arrived at a higher Appraised Value for the Property than he otherwise would have. 10/23 Tr. at 222:9-22.  Yet Mr. Rathlev conceded that, if a third appraiser had been engaged and if the third appraiser had 30 days to complete the appraisal, then the third appraiser's appraisal would not have been due until after November 5, 2018.  *Id*. at 226:21-227:6.  Mr. Rathlev failed to explain how CityPlace would have been harmed by the Trustee's delay if the third appraiser had been permitted to submit an appraisal after November 5, 2018.  *Id*. at 226:21-228:1.[11]

69.     Mr. Rajegowda was asked to explain how, if at all, CityPlace had been harmed by the Trustee's conduct.   Mr. Rajegowda testified that CityPlace personnel became "nervous" that the Trustee's conduct might impact their ability to refinance. 1/15 Tr. at 152:25-153:13.  **However, Mr. Rajegowda admitted that, despite its nervousness, CityPlace suffered no harm**. *Id.*

70.     **The Trustee's delay did not impact CityPlace's agreement with Alliance Bernstein, its new lender.  For instance, CityPlace did not pay any additional fees to Alliance Bernstein as a result of the Trustee's delay and the terms of the Alliance Bernstein loan, including the interest rate, remained the same.**  10/23 Tr. at 222:9-223:8.  **Alliance Bernstein did not penalize CityPlace as a result of the Trustee's conduct**.  1/15 Tr. at 152:22-24.

71.     Moreover, CityPlace had no right under the Loan Modification Agreement to challenge the MAI appraiser the Trustee selected, regardless of whether the appraiser was timely disclosed.  10/23 Tr. at 135:23-136:5.

---

[10] Alternatively, the Court finds that CityPlace's evidence of prejudice was not credible.
[11] Even if Mr. Lieberman had authored his report prior to zoning change application approval, his appraisal still would have been sufficiently high as to trigger the need for a third appraisal.  *E.g.,* 10/24 Tr. at 105-106.

72.    Further, a belated completion of the appraisal process set forth in Section 4.9(g) would not have prejudiced or harmed CityPlace. The Loan Modification Agreement did not set forth a specific due date for completion of the third appraiser's appraisal. Dx2 at 16. The third appraiser was permitted to finish any date between October 12 and December 11, 2018. *Id.* **As long as the appraisal process was completed pursuant to Section 4.9(g) by December 11, the Trustee's delay would have had no effect on the determination of the Appraised Value**.

*Mr. Lieberman's Dealings with CityPlace*

73.    Sometime prior to October 19, 2018, shortly after she was directed to deal with the CityPlace matter, Ms. Alvelo spoke to Mr. Lieberman. 1/14 Tr. at 77:3-9. Ms. Alvelo asked him to begin preparing the appraisal to be used for the refinancing now that the appraisal for the TIF Offering had been completed. *Id.* at 77:3-9. Thereafter, on October 19, 2018, Mr. Lieberman sent Ms. Alvelo an engagement letter. 10/24 Tr. at 169:13-18. Before signing the engagement letter, Ms. Alvelo and Mr. Lieberman exchanged multiple emails and communicated by telephone regarding the appraisal. *Id.* at 169:13-171:15.

74.    Ms. Alvelo signed the October 19, 2018 engagement letter on October 26, 2018, and she returned the countersigned letter to Mr. Lieberman on November 1, 2018. Dx174; 1/14 Tr. at 77:10-78:12.

75.    Mr. Lieberman began to collect information that he needed for his work before he received the signed engagement letter. 10/24 Tr. at 38:18-39:14; 1/14 Tr. at 176:16-18. Among other things, Mr. Lieberman reviewed market data and read relevant articles related to the Property. 10/24 Tr. at 38:18-39:5. Mr. Lieberman also reviewed reports related to the Property. 1/14 Tr. at 176:16-177:5. Mr. Lieberman nonetheless needed to collect information from CityPlace in order to complete the appraisal. 10/24 Tr. at 147:3-25, 177:6-14, 179:23-180:11.

76.    On November 6, 2018, Mr. Lieberman sent an email to Jordan Rathlev, requesting an update on the CityPlace information that he needed to perform the additional appraisal. Dx190. The same day, Mr. Lieberman sent a second email to Mr. Rathlev asking if there was a current Financing OM or Active Listing OM. Dx191.

77.    **Neither Mr. Rathlev, nor anyone at CityPlace, ever responded to Mr. Lieberman's requests for information**. 10/23 Tr. at 189:25-190:9. **Mr. Rathlev testified that CityPlace "ignored" Mr. Lieberman's requests for information**. *Id.* **This failure to respond to the request for information compounded CityPlace's refusal to respond to Ms. Kohut's October 5, 2018 request for information regarding the Property**.

78.     **Had CityPlace promptly provided Mr. Lieberman with the information he needed, he could have completed the appraisal within one to three weeks**. 10/24 Tr. at 177:15-18; Px180 at ¶ 10.  **CityPlace delayed Mr. Lieberman's completion of an appraisal**. 1/14 Tr. at 88:9-20; Px180 at ¶ 9.

79.     On November 13, 2018, CityPlace advised Berkadia's representatives that the most current actual and projected financial information for the Property was the information set forth in the booklet prepared by Eastdil.  10/24 Tr. at 179:23-183:4.  Eastdil was a broker that CityPlace had retained in the Spring of 2018 to find lenders to refinance the Loan.  10/23 Tr. at 120:12-15.  Berkadia promptly relayed this information to Mr. Lieberman.  10/24 Tr. at 120:12-20.  The Eastdil booklet was the only information that CityPlace provided to Mr. Lieberman in connection with the November 2018 appraisal.  *Id*. at 120:21-121:5.  Mr. Lieberman, however, needed additional information, including rent rolls, a lease activity report and updated financials in order to complete the appraisal.  *Id*. at 177:6-14.  **CityPlace never responded to Mr. Lieberman's requests**.  10/24 Tr. at 177:21-22.

80.     In mid-November 2018, Ms. Alvelo received CityPlace's third-quarter financial information, which she promptly forwarded to Mr. Lieberman on November 15, 2018.  1/14 Tr. at 87:4-12; Dx211.  Ms. Alvelo recognized that Mr. Lieberman needed this information in order to complete his appraisal.  1/14 Tr. at 87:19-88:2.

81.     Once Mr. Lieberman received this additional information, Mr. Lieberman completed his updated appraisal on November 23, 2018 (the "CBRE Appraisal").  10/24 Tr. at 185:9-11.  The Trustee thereupon sent it to CityPlace that same day.  10/23 Tr. at 114:18-23.  Ms. Alvelo did not believe that Mr. Lieberman delayed in providing his appraisal, 1/14 Tr. at 88:9-13, as CityPlace did not cooperate in providing Berkadia with the information Mr. Lieberman would need in order to complete his appraisal.  *Id.* at 88: 14-20.

### *The Appraisals of the Property*

82.     The Cushman Appraisal prepared by Mr. Walsh states that the fair market value of the Property is $120,000,000.  Px170 at 4.  **The Cushman Appraisal also contains a section on zoning that falsely stated that there is no pending application made for change in the zoning of the Property**.  *Id.* at 9-10, 97-98.

83.     The CBRE Appraisal prepared by Mr. Lieberman states that the fair market value of the Property is $155,000,000.  Dx223 at 2.  The CBRE Appraisal states that in November 2018, the City of West Palm Beach approved a resolution that would allow a 21-story, mixed-use, multi-

family residential apartment tower & retail on the former 1.31 acre Macy's department store anchor site, which was previously restricted to a 5-story building. 10/24 Tr. at 105:7-15, 211:3-10.

84.     The fair market value of the Property in the CBRE Appraisal and the Cushman Appraisal differs by $35,000,000. *Compare* Px170 at 4 *with* Dx223 at 2.

### *CityPlace and the Cushman Appraisal*

85.     CityPlace put in place an appraisal-process plan for its refinancing, before it sent the Notice of Refinance.

86.     The valuation in the Cushman Appraisal was based on a discounted cash flow or DCF analysis. 10/30 Tr. at 87:4-6. The discounted cash flow method takes the projected stream of earnings over a period of time and discounts it back to the present value. *Id.* at 103:23-104:7. In connection with such a calculation, the discounted cash flow method uses both a discount rate and a terminal cap rate. *Id.* at 105:16-23.

87.     It is well understood to the parties who use and prepare the discounted cash flow method that an increase in the discount rate or the terminal cap rate results in a decrease in the valuation and that a decrease in the discount rate or the terminal cap rate conversely results in an increase of the valuation. *Id.* at 106:15-107:10.

88.     On October 3, 2018, ten days before the Cushman Appraisal was finalized, Mr. Walsh emailed Mr. Rathlev and Ms. Penksa advising them that his preliminary valuation of the Property was $129,000,000. Dx135. Mr. Walsh disclosed that he used an 8.25% discount rate and a 7.25% terminal cap rate to determine that preliminary value. *Id.*; 10/30 Tr. at 108:6-16.

89.     In response, Mr. Rathlev said to Mr. Walsh that Mr. Walsh should use an 8.5% discount rate and a 7.5% terminal cap rate to determine fair market value of the Property. Dx134. Mr. Rathlev advised Mr. Walsh that these rates were based on market studies. *Id.* **Mr. Rathlev testified that he was not aware of any specific market studies that support those rates**. 10/23 Tr. at 197:15-198:6.

90.     The discount and cap rates suggested by Mr. Rathlev after incorporating other budgeted capital expenses produced a preliminary value of the Property of $110,000,000. 10/30 Tr. at 110:21-111:1.

91.     After that revised preliminary valuation was determined, the amount of income projected for the Property decreased. Consequently, after conferring with Mr. Rathlev and calculating different valuation scenarios, Ms. Penksa advised Mr. Walsh that CityPlace "would be

comfortable" using an 8.0% discount rate and 7.0% terminal cap rate.  Dx136; 10/30 Tr. at 112:1-4.  Use of those rates resulted in a $120,000,000 valuation of the Property.  10/30 Tr. at 112:5-8.

92.     Thereafter, the amount of the projected income for the Property increased significantly.  Mr. Walsh adjusted the discount rate to 8.75% and the terminal cap rate to 7.50%.  Dx152.  Those rates produced a valuation of $120,000,000, which Mr. Walsh used in the Cushman Appraisal.  *Id.*

93.     Mr. Rathlev and Ms. Penksa wanted to alter the discount rate and cap rate used by Mr. Walsh in order to lower the value of the Property and to reduce the Net Refinancing Proceeds to avoid triggering payments under Tranche B of the Loan.

94.     In email communications that occurred on October 9, 2018, Mr. Rathlev asked Ms. Penksa to calculate the Property's value using discount and cap rates that were lower than the rates previously provided to Mr. Walsh.  Mr. Penksa questioned Mr. Rathlev's request, stating "it was not the direction we wanted to go in." Dx151.  Ms. Penksa thought that Mr. Rathlev wanted higher rates to deal with the CBRE appraisal, *see* 1/16 Tr. at 16:5-20, but Mr. Rathlev, in fact, was interested in lower rates to use with Alliance Bernstein. *Id.* at 16:13-17-11.

95.     Mr. Rathlev advised Ms. Penksa that the lower rates were for purposes of the appraisal that CityPlace's new lender, Alliance Bernstein, had commissioned in order to determine the value of collateral for the new loan.  Dx150.  Mr. Rathlev stated that Alliance Bernstein "needs to have an appraisal over $135 million for [CityPlace] to get full proceeds and I am just curious what it will take to get there."  *Id.*

96.     On November 30, 2018, Gregory Becker of Newmark Knight Frank, the appraiser that Alliance Bernstein commissioned to determine the value of the Property, issued an appraisal (the "AB Appraisal").  1/15 Tr. at 40:8-22.  The Macy's site was not part of the collateral that served as security for the loan CityPlace received from Alliance Bernstein.  1/15 Tr. at 68:3-6.  The AB Appraisal determined the fair market value of the Property as of November 8, 2018 (excluding any value attributable to the Macy's site) to be $163,600,000.  1/15 Tr. at 63:9-13.

97.     **CityPlace provided Mr. Becker with information that it did not provide to Mr. Walsh**.  CityPlace provided Mr. Becker the lease and comparable sales information and information related to exceptional pricing for comparable assets and Rosemary Square comparable sales.  1/15 Tr. at 52:23-53:22, 56:1-58:9; Dx213, Dx214, Dx215.  Mr. Becker relied on this information in preparing his appraisal.  1/15 Tr. at 58:6-9.

98.     Ms. Penksa claimed to have little recollection of any of the information that CityPlace provided to Mr. Walsh.  Mr. Penksa was asked whether Mr. Walsh ever requested information related to future capitalization, income and expense statements for the past three years, year to date income and expense statements for 2018, or budgets for the past year.  1/15 Tr. at 190:12-191:23.  Ms. Penksa could not confirm that any of this information was provided.  *Id.*  Ms. Penksa was also asked whether Mr. Walsh was ever provided with the Eastdil offering memorandum, *id.* at 192:1-11, and Ms. Penksa acknowledged that, although she provided information to Eastdil in connection with Eastdil's preparation of the offering memorandum, she could not confirm that she provided the offering memorandum to Mr. Walsh.  *Id.*

*CityPlace's Zoning Application*

99.     In May 2018, CityPlace filed an application with the City of West Palm Beach to rezone the portion of the Property that consisted of the site that had been used by Macy's for a department store.  10/23 Tr. at 38:25-39:18; Px9.  That application sought to rezone that portion of the Property to permit CityPlace to construct a 300-unit, 21-story apartment building on the site.  Px9.  Approval of that application and construction of the apartment building would substantially increase the value of the Property.  Dx223.

100.     **It is undisputed that CityPlace did not inform Mr. Walsh that CityPlace had filed an application with the City of West Palm Beach to change the zoning for the Property. CityPlace did not advise Mr. Walsh of the fact of the application**.  10/30 Tr. at 96:8-10, 102:14-22.  **Nor did CityPlace advise Mr. Walsh of the extensive negotiations that CityPlace had been having with the City of West Palm Beach Planning Department**.  1/15 Tr. at 189:4-190:6. **Nor did CityPlace advise Mr. Walsh of the hearing that the Planning Board held at the end of September 2018**.  *Id.*

101.     The Cushman Appraisal was finalized by Mr. Walsh on October 12, 2018.  Px170.  In the Cushman Appraisal, there is a section entitled Zoning.  *Id.* at 97.  **In that section, Mr. Walsh stated there was no pending application for change in the zoning of the Property**.  *Id.*  Mr. Walsh admitted under oath that this representation was not true.  10/30 Tr. at 122:6-21.

102.     Mr. Walsh did not learn of CityPlace's zoning change application for the Macy's site until after the application was approved on November 5, 2018.  10/30 Tr. at 123:25-124:9.

103.     Ms. Penksa provided Mr. Walsh with the information to prepare his appraisal.  1/15 Tr. at 182:7-11.  Ms. Penksa never told Mr. Walsh about the zoning application, despite knowing about the application when Mr. Walsh was performing the appraisal.  *Id.* at 188:5-189:10.  Mr.

Rathlev accompanied Mr. Walsh on Mr. Walsh's site visit of the Property.  10/30 Tr. at 91:4-19.
During the visit, Mr. Rathlev and Mr. Walsh walked past the Macy's site, but Mr. Rathlev never
told Mr. Walsh that CityPlace had filed a zoning application and was developing plans to build a
21-story tower on the site.  *Id.* at 96:3-10.  When Mr. Walsh asked Mr. Rathlev about the Macy's
site, Mr. Rathlev told him that CityPlace did not know what it would do with the site and stated
that CityPlace was considering several different alternatives.  *Id.* at 102:14-22.  CityPlace did not
provide Mr. Walsh with any information related to what might happen to the Macy's site, and Mr.
Walsh found Mr. Rathlev's responses to be "vague."  *Id.*

104.    Ms. Penksa testified that she exercises care when performing her job.  1/15 Tr. at
198:20-22.  She wants to make sure that her work is accurate, correct and performed the right way.
*Id.* at 198:23-199:1.  When she reviewed Mr. Walsh's draft appraisal report, Ms. Penksa testified
that she paid attention to the details of the report.  *Id.* at 198:16-199:1. Ms. Penksa reviewed each
page of Mr. Walsh's draft appraisal and provided handwritten comments.  *Id.* at 197:18-21, 198:3-
199:25; Dx166.  Ms. Penksa's handwritten notes reflect Ms. Penksa's care and attention to detail.
For instance, Ms. Penksa recommended that Mr. Walsh revise "market value" to "fair market
value."  *Id.* at 198:10-13; Dx166 at 7.  If Ms. Penksa did not have any comments on a particular
page, she affirmatively wrote "no comment" on that page.  1/16 Tr. at 3:19-4:1.  Ms. Penksa did
this because she "wanted to make sure he [Mr. Walsh] knew there were no comments on the next
pages."  *Id.*

105.    Ms. Penksa reviewed page 1208 of the draft, which contained the false
representation that CityPlace had not applied for a zoning change.  1/16 Tr. at 4:7-6:8.  Despite
knowing the statement was inaccurate, she wrote "no comments" on page 1208.  Dx166 at 27.
When asked why she did not correct this misrepresentation, Ms. Penksa testified, "I think that was
just something I overlooked."  *Id.* at 4:16-22.  When asked whether the representation on page
1208 related to CityPlace's zoning application was inaccurate, Ms. Penksa admitted that the
statement was false.  *Id.* at 4:16-6:8.

106.    Mr. Walsh did not determine whether it was reasonably probable that the zoning
application would be approved.  10/30 Tr. at 134:9-135:4.  Mr. Walsh also did not determine what
impact the zoning application would have on current market values.  *Id.* 135:5-7.

107.    Mr. Rathlev, however, did not withhold information about the pending zoning
application from Eastdil or CityPlace's new lender Alliance Bernstein.  10/23 Tr. at 152:5-15;
Dx65.

108.    Mr. Rathlev provided Eastdil with a copy of marketing materials that CityPlace was using to solicit new tenants that discussed the residential tower on the Macy's site. Dx65.   In July 2018, CityPlace distributed marketing materials to prospective tenants for retail space in the Property.  The purpose of those materials was to induce the prospective tenants to sign a lease. 10/23 Tr. at 253:20-23.  The materials stated that "[t]he future mixed-use residential tower at the former Macy's site will capitalize on the booming residential population, rapidly expanding public transit, and strong growth in the fashion, design, entertainment, and tourism sectors," and that the development "provides the most centrally located residential property in all of downtown and will include approximately 325 luxury rental apartments and 60,000 square feet of retail, F&B, and co-working office space." Dx5 at 27.

109.    On August 17, 2018, in a communication discussing the preliminary value of the Property to support a loan from Alliance Bernstein, Mr. Rathlev advised representatives of Alliance Bernstein and Eastdil that a "300-unit residential tower" was planned for the Macy's site. Dx65.

110.    Beginning in 2017, CityPlace began to expend funds for development of the Macy's site.  10/23 Tr. at 179:22-180:6.  Each month, CityPlace prepared budgets regarding its actual expenditures.  Those budgets reflected that CityPlace had expended $8.6 million as of August 10, 2018 and $8.9 million by the middle of October 2018.  Dx184.

111.    CityPlace began preparing a pre-development budget for the Macy's site in 2017. 10/23 Tr. at 179:22-180:6.  In the summer of 2018, CityPlace prepared a predevelopment budget, in which CityPlace forecasted when it would begin construction.  Dx54.  CityPlace relied on the best information it had available at the time to prepare its forecasts.  1/16 Tr. at 68:19-22.  In the summer of 2018, based on the best information available at the time, CityPlace forecasted that it would be able to begin construction of the 21-story residential tower at the Macy's site by October, 2019.  10/23 179:7-24; Dx54

112.    Ms. Penksa prepared an updated pre-development budget for the Macy's site as of November 1, 2018.  Dx186.  The budget was based on CityPlace's "best estimate" at the time and contemplated CityPlace beginning construction on the Macy's site by October 2019.  1/16 Tr. at 68:19-22.

113.    By the beginning of October 2018, ten days before Mr. Walsh's appraisal was to be completed, CityPlace also had completed its negotiations with the City of West Palm Beach Planning Department.  10/23 Tr. at 244:21-245:17; 1/15 Tr. at 110:15-112:14; Dx129.  CityPlace

consequently concluded that its zoning application was likely to be approved.  1/15 Tr. at 147:18-148:12; Dx155.

114.    Virtually all of the issues raised in the negotiations by the Planning Department had been resolved in early September.  10/23 Tr. at 239:21-240:21.  One last issue remained.  CityPlace engaged in active negotiations with the City of West Palm Beach concerning the percentage of the proposed residential tower that would be set aside for affordable workforce housing.  1/15 Tr. at 106:18-107:2.

115.    On October 2, 2018, Armando Fana, Director of the Department of Housing and Community Development, emailed Mr. Rathlev to tell him that his department accepted CityPlace's affordable workforce housing proposal and that his staff would be recommending approval of the application.  1/15 Tr. at 110:15-112:14; Dx129.

116.    In addition, while the negotiations with the Planning Department were occurring, CityPlace management advised senior management of Related that CityPlace had been having ongoing discussions with other government officials in the City of West Palm Beach.  Dx155. They reported to Related management, among other things, that the Mayor of the City was supportive of the zoning application.  10/23 Tr. at 229:3-11; Dx29.

117.    On November 5, 2018, the City of West Palm Beach Commission approved the zoning application at a public meeting.  Px123 at 21.

### CityPlace's Refusal to Complete the Appraisal Process Would Substantially Prejudice the Trustee and Would Provide CityPlace with a Windfall

118.    For the reasons set forth below, if CityPlace's unilateral appraisal controls the Section 4.9 refinancing process, the Trustee could lose, and CityPlace would avoid paying, as much as $10.3 million in Net Refinancing Proceeds to the noteholders of the Loan.

119.    The Trustee's CBRE appraisal set forth an appraised value of $155 million for CityPlace, Dx223, while CityPlace's Cushman Appraisal set forth an appraised value of $120 million.  Px170.

120.    Because the difference between the two appraised values was greater than five percent, under Section 4.9(g)(i) of the Loan Modification Agreement, a third Qualified Appraiser should have been appointed to determine the Appraised Value of the Property for the purpose of calculating Net Refinancing Proceeds to be distributed to the Trustee at the closing.  Px7.

121.    Any Net Refinancing Proceeds that the Trustee receives would be distributed to noteholders of the CMBS Trust for which the Trustee is the trustee in accordance with the waterfall for that Trust.  1/14 149:21-150:5; Px7.

122.    CityPlace, however, refused to cooperate in retaining a third Qualified Appraiser to determine the Appraised Value, and instead maintained that only the Cushman Appraisal could be utilized.  1/14 Tr. at 88:14-20.

123.    Under the waterfall formula set forth in Section 4.9(c) of the Loan Modification Agreement, if the $120 million valuation set forth in the Cushman Appraisal was used to determine the Appraised Value, the Net Refinancing Proceeds to be distributed at closing would be zero. 1/14 Tr. at 168:1-14.

124.    Under the waterfall formula set forth in Section 4.9(c), if the Cushman Appraisal and the CBRE Appraisal are considered in determining the Appraised Value and a third Qualified Appraiser were to value the Property at $140 million, the Net Refinancing Proceeds would be $6.6 million.  1/14 Tr. at 168:25-169:5.  Moreover, if the third Qualified Appraiser were to value the Property as the $155 million valuation set forth in the CBRE Appraisal, the Trustee would receive as much as $10.3 million.  *Id.* at 168:15-24.

125.    **Further, as stated above, if the parties had completed the entire appraisal process, CityPlace would not have been injured or prejudiced in any manner as a result of the Trustee's delay in providing notice of the identity of its appraiser**. CityPlace could have closed on its mortgage and paid its debt to the Trustee on the December 11, 2018 maturity date had the parties completed the entire appraisal process.  10/24 Tr. at 177:15-24; 1/14 Tr. at 76:15-18, 85:7-10.  CityPlace did not incur any additional costs related to its payment to Alliance Bernstein when it closed on its mortgage in December.  1/16 Tr. at 222:15-22.  CityPlace also did not have to pay a higher interest rate to Alliance Bernstein; nor did CityPlace incur any changes to the payoff terms under the mortgage.  *Id.* at 222:24- 223:8.

### Section 4.9(g)'s Requirements for the Appraisals

126.    The Loan Modification Agreement required that the Trustee and CityPlace obtain MAI Appraisals for the Property.  Dx2 at 16.

127.    Section 4.9(g)(v) defines "MAI Appraisal" to "mean an appraisal of the Property performed in accordance with the Uniform Standards of the Professional Appraisal Practice shall meet the minimum appraisal standards for national banks promulgated by the Comptroller of the

Currency pursuant to Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ['FIRREA']." Dx2 at 17.

128.     FIRREA requires that "[e]ach appraisal must contain an estimate of market value, as defined by the Agencies' appraisal regulations." Dx241 at 16.

129.     Under the definition section contained in the interagency guidelines to FIRREA found at 12 C.F.R. 34.42(h), Market Value,

> means the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:
>
> (1) Buyer and seller are typically motivated;
>
> (2) Both parties are well informed or well advised, and acting in what they consider their own best interests;
>
> (3) A reasonable time is allowed for exposure in the open market;
>
> (4) Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
>
> (5) The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

Dx244 at 5.

130.     Implicit in the definition of "Market Value" is that, among other things, "[b]oth parties are well informed and well advised, and acting in what they consider their own best interests." In that regard, information is not to be withheld from either party. Dx244 at 5; 10/31 Tr. at 84:10-18; 1/17 Tr. at 122:15-123:1, 123:20-124:4.

131.     Pursuant to FIRREA, "[t]he estimate of market value should consider the real property's actual physical condition, use, and zoning as of the effective date of the appraiser's opinion of value. For a transaction financing construction or renovation of a building, an institution would generally request an appraiser to provide the property's current market value in its 'as is' condition, and, as applicable, its prospective market value upon completion and/or prospective market value upon stabilization. Prospective market value opinions should be based

upon current and reasonably expected market conditions. When an appraisal includes prospective market value opinions, there should be a point of reference to the market conditions and time frame on which the appraiser based the analysis. An institution should understand the real property's 'as is' market value and should consider the prospective market value that corresponds to the credit decision and the phase of the project being funded, if applicable." Dx241 at 16.

132.   Moreover, USPAP Standard Rule 1-3 states that an appraiser must: "(a) identify and analyze the effect on use and value of existing land use regulations, reasonably probable modifications of such land use regulations, economic supply and demand, the physical adaptability of the real estate, and market area trends; and (b) develop an opinion of the highest and best use of the real estate." Dx243 at 29.

133.   The comment to USPAP Standard Rule 1-3 states "[a]n appraiser must analyze the relevant legal, physical, and economic factors to the extent necessary to support the appraisers highest and best use conclusion(s)." *Id.*

134.   Both parties called expert witnesses in this case to opine on the appraisal standards required under Section 4.9(g)(v) of the Loan Modification Agreement.  CityPlace proffered Val K. Chiasson, and the Trustee proffered Ted Whitmer as its expert.

135.   The Court has considered the testimony of both experts.  Both individuals are qualified to render their opinions, **but the Court finds that Mr. Whitmer's opinions were more credible insofar as they accurately reflect the requirements under both USPAP and FIRREA**.  Moreover, Mr. Whitmer provided substantial support for his opinions, in contrast to Mr. Chiasson. 1/16 Tr. at 135:20-136:7, 143:5-146:6, 148:20-149:21, 153:25-156:88.

136.   Mr. Whitmer testified that, in order for the buyer and seller to act prudently and knowledgeably, the definition of market value requires that both the buyer and seller be well informed of the characteristics of the property. 1/16 Tr. at 122:15-123:1, 123:20-124:4.

137.   Mr. Whitmer opined that there is consistency between FIRREA and USPAP. 1/16 Tr. at 111:17-24.  In order to comply with FIRREA, an appraisal must comply with USPAP. *Id.;* Dx244 at 2. Specifically, Standards 1-3 and 1-4 of USPAP do not conflict with FIRREA. *Id.* at 122:5-7. Mr. Whitmer cogently explained why Advisory Opinion No. 30 of USPAP does not permit an appraiser to disregard those two rules and that Mr. Chiasson's reading of that Advisory Opinion was fundamentally flawed. 1/16 Tr. at 156:9-159:9.

138.   Mr. Whitmer testified that, under Standard 1-3 of USPAP, an appraiser must identify and analyze the effect on use and value of the existing land use regulations and reasonably

probable modifications of such land use regulations.  1/16 Tr. at 119:25-120:11.  Mr. Whitmer opined that an appraisal cannot be USPAP or FIRREA compliant if the appraiser fails to comply with the mandatory requirement of identifying and analyzing the probability of a change of zoning and its effect on market values.  *Id.* at 165:22-25.

139.    Mr. Whitmer opined that, if there is a reasonably probable modification to zoning for the property, the first thing an appraiser should do is look at the current zoning in place.  1/16 Tr. at 130:9-17.  Next, Standard 1-3 requires the appraiser to identify and analyze any reasonably probable modification of such land use.  *Id.* at 130:18-20.  Then, as part of the definition for "as-is market value," the appraiser must factor the probable zoning change into the valuation.  *Id.* at 130:21-25.  There cannot be an "as is" value if the appraiser does not take zoning into consideration.  *Id.* at 131:7-24 ("I can't have an as-is value if I don't consider what the market does, if I don't analyze and identify what the market would identify and analyze in reaching an "as-is" value conclusion.  So, the market is going to say, not just necessarily zoning changes, but could be relocation, pretend like Amazon is coming, or there is a hurricane out in the Gulf.  I would have to look at the current physical condition, use, and zoning, but I would have to do what the market would do.  Any prudent – because we have looked at the definition, they need to be prudent, well informed.  Any prudent, well informed market participant, and thus the appraiser would have to consider to finalize anything out there that might affect the value.").

140.    Mr. Whitmer opined that the failure to analyze the reasonable probability of a change of zoning would not be compliant with FIRREA because it would create a scenario where the buyers and sellers are purposely ignoring a change that the market would not ignore and are therefore not well informed.  1/16 Tr. at 166:5-15.  Additionally, failure to account for the reasonable probability of a zoning change would result in an appraisal that does not contain the "as is" value, but would instead be a hypothetical valuation under USPAP and FIRREA.  *Id.*

141.    Mr. Whitmer opined that an appraiser would have to conclude that there is a reasonable probability of a zoning change when the borrower informed the appraiser that the Housing Department the Planning Board, the Planning Department and the Zoning Department all recommended approval of a change in zoning to the City Commission and that the borrower had been budgeting out 11 months for breaking ground and had a proposed date for the ground breaking based on a change in zoning.  1/17 Tr. at 74:5-20.  During the course of the trial, the Trustee established a factual foundation in this case for each component of that hypothetical.

142.   **Mr. Chiasson conceded that, if there is evidence in the present that the market expects a future event will occur, it is not speculation to look at the impact of that event on the *present*, *current* value, and that this process is consistent with FIRREA**. *See* 10/31 Tr. at 44:8-45:21 ("If you have current data that supports the fact that buyers are paying a premium before something occurs, that is—you are now taking the speculation away, you are not basing the value on a future, you are basing the value on existing comparable data, current data.").

143.   Mr. Chiasson further acknowledged that USPAP and FIRREA expect an appraiser to take the extra step to make sure that he or she has considered all the available current data that may bear on the market value of the property.   10/31 Tr. at 53:13-17.

144.   On cross-examination, Mr. Chiasson conceded that the purpose of FIRREA for an "as is" appraisal is to give an informed report about a property's current market value.   10/31 Tr. at 51:16-19.   **Mr. Chiasson agreed that it is important for an appraiser determining the market value, like the buyer and seller, to be knowledgeable and well informed**. *Id*. at 82:19-21.   **Therefore, it would be inappropriate for a property owner to conceal information from an appraiser who is trying to determine the market value for purpose of a FIRREA compliant appraisal**. *Id.* at 84:10-18.

## III.    CONCLUSIONS OF LAW

Each party has requested a declaratory judgment from this Court declaring, essentially, that its actions were proper in regards to the refinancing and appraisal process of the CityPlace Property.   Based upon the Court's findings of fact, the Court enters judgment in favor of the Trustee for four reasons: (A) CityPlace's claim is barred by the doctrine of disproportionate forfeiture; (B) CityPlace's claim is barred because it breached its duty to cooperate in the appraisal process; (C) CityPlace's claim is barred because its appraisal was void; and (D) CityPlace's claim is barred because it breached its duty of good faith and fair dealing in the appraisal process.   The Court then briefly addresses (E) the Trustee's request for attorney's fees.   Each issue is discussed in turn.

A.     **First Basis for the Court's Judgment – CityPlace's Claim is Barred Because it Would Result in a Disproportionate, Substantial Forfeiture**

The Trustee contends that, even if the Trustee breached its appointment and notice obligations under the Loan Modification Agreement, CityPlace's claim for a declaratory judgment is barred under the doctrine of substantial forfeiture. There is no evidence that the Trustee was unable to produce an appraisal prior to the refinancing deadline because the Trustee did so, and CityPlace was not prevented by the Trustee from refinancing without penalty because CityPlace did so, as the Court observed in denying summary judgment. Decision at 16. With the benefit of a full trial record, the Court holds that CityPlace's claim is barred under this doctrine.

Under the doctrine of substantial forfeiture, a Court may excuse a party's failure to comply with a contractual obligation if the failure would result in a "disproportionate forfeiture," and the failure to comply was not with respect to a condition that formed a "material part of the agreed exchange." *Pramco III, LLC v. Partners Trust Bank*, 842 N.Y.S.2d 174, 182 (Sup. Ct. 2007), *aff'd*, 860 N.Y.S.2d 775 (App. Div. 2008); *accord Schweizer v. Sikorsky Aircraft Corp.*, 634 F. App'x 827, 829-30 (2d Cir. 2015); *Danco Electrical Contractors, Inc. v. Dormitory Authority*, 75 N.Y.S.3d 28, 29 (App. Div. 2018).

The doctrine of disproportionate forfeiture will bar a claim when the party seeking to excuse the nonoccurrence of a condition precedent (here, the Trustee) will "los[e] its right to the agreed exchange after [it] has relied substantially, as by preparation or performance on the expectation of that exchange"; the party "conferred a benefit on the other party"; and the unsatisfied condition is not "a material part of the agreed exchange." *Pramco III*, 842 N.Y.S.2d at 185 (citing *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 691-94 (App. Div. 1995)).

Under Section 4.9(f) of the Loan Modification Agreement, the Net Refinancing Proceeds due from CityPlace upon a refinancing is determined under a formula that is largely based on the

Property's Appraised Value determined in accordance with Section 4.9(g). If there is positive Net Refinancing Proceeds, a portion of those proceeds is paid to the Trustee and ultimately the noteholders of the CMBS Trust that owns the Loan. The amount to be paid to the noteholders is determined in accordance with the waterfall provisions of the Loan Agreements. In that regard, the higher the Appraised Value, the larger the amount of the Net Refinancing Proceeds and the larger the amount that is to be paid to the noteholders.

The Trustee's CBRE appraisal set forth an appraised value of $155 million for CityPlace, while CityPlace's Cushman & Wakefield appraisal set forth an appraised value of $120 million. Because of the significant difference between these two values (*i.e.,* the difference exceeds five percent), a third Qualified Appraiser would have been appointed,[12] had the appraisal process been completed according to the terms of the Loan. Depending on the value reached by the third appraiser and the calculation of the waterfall, the Trustee could receive as much as $10,353,229.64 if the third appraiser's value of the Property was also $155 million.

Under that waterfall formula, if only CityPlace's $120 million valuation is used to determine the Appraised Value (as CityPlace contends should be the case), the Trustee would receive no payment under the Tranche B Note established by the Loan Modification Agreement. In such circumstances, the Trustee and ultimately the noteholders will have lost the benefit to which they are entitled under the Loan Modification Agreement after having conferred a benefit on CityPlace in the form of the modification in the Loan Modification Agreement when CityPlace was in default under the Loan.

Further, one party's obligation to notify the other of the identity of its Qualified Appraiser was not a material part of the parties' bargain. The purpose of Section 4.9(g) of the Loan

---

[12] Even if Mr. Lieberman had authored his report prior to the zoning change application approval, his appraisal still would have been sufficiently high as to trigger the need for a third appraisal. *E.g.,* 10/24 Tr. at 105-106.

Modification Agreement was to ensure that the Appraised Value was determined in time to permit a refinancing to occur.  As noted above, nothing about the delay of ten days in CityPlace's receipt of a written notice was material or interfered with such an outcome.

In *Danco Electrical Contractors*, the plaintiff-contractor failed to submit verified statements contesting the defendant's calculations of the amounts that the defendant would pay for extra work that the plaintiff had completed pursuant to a series of change orders.  It was undisputed that the submission of such verified statements was a condition precedent to plaintiff's right to recover the extra payments and that plaintiff had failed to submit them.  75 N.Y.S.3d at 29.  The trial court barred the plaintiff from recovering the additional payments, citing the plaintiff's failure to strictly comply with the condition precedent.  The Appellate Division, however, reversed, holding that the "plaintiff should be excused from the non-occurrence of that condition, because otherwise it would suffer a disproportionate forfeiture, and the occurrence of the condition was not a material part of the exchange."  *Id*.  The court held that "the failure to strictly comply with a condition precedent should be excused to avoid a disproportionate forfeiture under the circumstances of a case such as this, where the noncompliance is *de minimis* and defendant has shown no prejudice whatsoever."  *Id*.

Just as in *Danco Electrical Contractors*, the breach before the Court is *de minimis*.  CityPlace suffered no prejudice.  On the other hand, the noteholders stand to lose millions of dollars over a technical, inconsequential delay.

The Court holds that such a loss to the noteholders would be disproportionate to the lack of harm caused by the Trustee's *de minimis* violation and that, to the extent that the Trustee violated its obligations under Section 4.9(g), such a violation should be excused.

**B.      Second Basis for the Court's Judgment – CityPlace Breached its Express Duty to Cooperate Under Section 4.9(g)(ii)**

The Trustee contends that CityPlace breached its duty to cooperate.  Under Section 4.9(g)(ii) of the Loan Modification Agreement, CityPlace had an obligation to reasonably cooperate with the Trustee's attempts to obtain an appraisal and with requests for information from the Trustee and the Trustee's appraiser.  Further, the Loan Modification Agreement required CityPlace to respond to such requests with reasonable effort.  *See* Decision at 11.[13]

CityPlace breached its duty to cooperate by failing to provide the Trustee with the information that it requested.  On October 5, 2018, Ms. Kohut of Berkadia asked CityPlace to provide certain information in order for the Trustee to complete its appraisal.  In response, CityPlace asserted that the Trustee had failed to timely appoint a Qualified Appraiser, refused to participate in the appraisal process and refused to respond to Ms. Kohut's request.  On November 6, Mr. Lieberman also requested certain information necessary to complete his updated appraisal of the Property.  CityPlace disregarded the request.

It was not until mid-November 2018 that CityPlace provided third quarter financial data and confirmed that the most recent financial information regarding the projected income and expenses for the Property were set forth in the Eastdil book.  Mr. Lieberman thereafter used that financial information and completed his appraisal less than two weeks later on November 23, 2018, which was delivered to CityPlace that same day.

Even assuming that the Trustee was in breach of its appointment obligations, the Loan Modification Agreement did not authorize CityPlace to shut down the appraisal process

---

[13] Additionally, to the extent CityPlace contends that the Trustee breached the Loan Agreement due to the Trustee's failure to produce a timely appraisal, New York law provides that a party cannot claim a breach of a contractual condition when it has taken acts to frustrate or prevent the other party from satisfying that condition.  *See ADC Orange, Inc. v. Coyote Acres, Inc.*, 7 N.Y.3d 484, 490 (2006); *Kooleraire Service & Installation Corp. v. Board of Education*, 28 N.Y.2d 101, 106 (1971) ("[A] party to a contract cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition.").  Consistent with the Court's findings of fact, CityPlace frustrated the Trustee's efforts to produce an appraisal prior to the maturity date.

unilaterally.  Moreover, CityPlace's contention that it had no duty to respond to the Trustee's untimely requests for information cannot be squared with the plain language of Section 4.9(g)(ii) of the Loan Modification Agreement, which mandates reasonable efforts to respond to requests for information.

Section 4.9(g)(ii) imposed on CityPlace an express duty to cooperate in the appraisal process.  That provision states: "All requests for information related to any MAI Appraisal being obtained shall be submitted in writing to Borrower, and Borrower shall use reasonable efforts to respond with the requested information within five (5) Business Days following receipt of such request."  That provision does not condition CityPlace's duty to cooperate on the Trustee's compliance with its notice obligation.  On the contrary, the use of the mandatory term "shall" makes clear that Section 4.9(g)(ii) required CityPlace's cooperation, regardless of whether CityPlace believed the Trustee to be in breach of its obligations under Section 4.9(g)(i).

In summary, CityPlace cannot complain about a delay in the appraisal process when CityPlace substantially contributed to the delay in the appraisal process.  Furthermore, while time may have been of the essence for the refinancing itself, there was still ample time for the refinancing to occur after the Trustee's brief delay in formally providing CityPlace with notice of its appraiser's identity.  Thus, to the extent the timeliness of the refinancing was thrown into doubt, that was in turn attributable to the delay and uncertainty that CityPlace injected into the appraisal process; the Trustee was utilizing its best efforts to rapidly produce an appraisal.  Accordingly, the Court holds that CityPlace's refusal to cooperate and provide the Trustee and Mr. Lieberman with information constituted a breach of the obligations under Section 4.9(g)(ii) and frustrated the Trustee's ability to deliver a timely appraisal.

**C.**     **Third Basis for the Court's Judgment – CityPlace's Appraisal is Void**

Independent of its other defenses, the Trustee contends that CityPlace's appraisal is void and may not be used to determine the Property's Appraisal Value for two separate but related reasons. First, the Trustee contends that the Cushman & Wakefield appraisal fails to comply with the specific requirements set forth in Section 4.9(g)(v) for an MAI Appraisal. Second, the Trustee contends that CityPlace breached its implied duty of good faith and fair dealing by intentionally manipulating the appraisal prepared by Mr. Walsh and concealing material information, including the fact of the zoning application filed by CityPlace, from Mr. Walsh and Cushman & Wakefield.

If CityPlace's appraisal is void under Section 4.9(g) of the Loan Modification, it cannot serve as a basis for determining the Appraised Value, and the parties must therefore begin the appraisal process under Section 4.9(g) anew.

**The Cushman & Wakefield Appraisal Does not Comply with USPAP and FIRREA**

Under Section 4.9(g)(v) of the Loan Modification Agreement, appraisals conducted for refinance must comply with USPAP and meet the "minimum appraisal standards for national banks," the "FIRREA" standards. The FIRREA standards require that "[e]ach appraisal must contain an estimate of market value, as defined by the Agencies' appraisal regulations." Interagency Appraisal and Evaluation Guidelines, 75 Fed. Reg. 77450, 77459 (Dec. 10, 2010).

"Market value means the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably." 12 C.F.R. § 34.42(h). "The estimate of market value should consider the real property's actual physical condition, use, and zoning as of the effective date of the appraiser's opinion of value." 75 Fed. Reg. at 77459. Market value is not determined solely with reference to the property's actual zoning status "as of" the date of the appraisal. The appraiser

must evaluate the market value "based upon current and reasonably expected market conditions." *Id*.

USPAP Standard 1-3 provides that: "When necessary for credible assignment results in developing a market value opinion, an appraiser must: (a) identify and analyze the effect on use and value of existing land use regulations, reasonably probable modifications of such land use regulations, economic supply and demand, the physical adaptability of the real estate, and market area trends."

Under FIRREA, compliance with Standard 1-3 is mandatory for a market value opinion. 1/16 Tr. at 119:25-120:11. Among other things, Standard 1-3 requires an appraiser to identify and analyze reasonably probable modifications of land use regulations. *Id.* at 120:6-11; *see id.* at 134:2-135:19. There cannot be an "as is" valuation without considering what the market would identify and analyze. *Id.* at 131:5-24. If the appraiser fails to identify and analyze a reasonably probable zoning change *affecting the market on the "as-is" date*, which would not be compliant with FIRREA, the appraiser has created a hypothetical condition. *Id.* at 131:25-132:122, 165:12-166:22-66. The existing valuation would not be an "as is" appraisal. *Id*. at 166:18-22.

Mr. Walsh did not know that CityPlace had a pending application to rezone the Macy's site, and he assumed that there was no such application pending. Mr. Walsh lacked this knowledge because CityPlace had withheld it from him and had never advised Mr. Walsh that CityPlace had filed the zoning application, that CityPlace had had extensive negotiations with City of West Palm Beach officials regarding the application, that CityPlace's application had been endorsed by the Planning Board in late September 2018, that CityPlace successfully concluded all negotiations with the Department of Housing and Community Development on October 2, 2018 and that CityPlace's application was to be decided by the City of West Palm Beach at the November 5, 2018 hearing. As a result of CityPlace's conduct, Mr. Walsh's appraisal contains the following

false statement: "Zoning Change Applied For: Not applicable." The appraisal also falsely states that: "We analyzed the zoning requirements in relation to the subject property, and considered the compliance of the existing or proposed use."

Mr. Walsh never analyzed the effect of the zoning application, as he was required to do under USPAP and FIRREA. The evidence established that, as Mr. Whitmer opined, the application submitted by CityPlace constituted a reasonably probable modification of the zoning for the Macy's site. CityPlace had obtained staff approval after extensive negotiations and believed that it had the support of the Mayor of the City of West Palm Beach and other municipal officials for the application. Further, CityPlace had already expended significant sums on the development of a 21-story apartment building on the Macy's site while Mr. Walsh was performing his appraisal, and had projected an October 2019 ground breaking.

As the Court previously held, "[U]nder USPAP and FIRREA, an appraisal must determine the market value of the property." *See* Decision at 16. "Under those provisions, however, if there is a pending zoning application, an appraiser must analyze the effect of the zoning application on the market value of the property." *Id.*

The Trustee presented substantial evidence that FIRREA and USPAP required analysis of the zoning application and its impact on value. The Trustee's expert, Ted Whitmer, opined that FIRREA requires an appraiser to reach an estimate of market value and that the most important requirement of FIRREA is that the appraisal be USPAP compliant. Further, Mr. Whitmer pointed to the express language of Standard 1-3 that requires an appraiser to identify and analyze the reasonably probable modifications of land use, which includes changes to zoning. Mr. Whitmer explained that FIRREA requires an appraiser to examine and analyze reasonably probable land use modifications, and an appraisal cannot constitute an "as-is" appraisal if the appraiser fails to consider the effect of such modifications when determining market value. Further, under

questioning from the Court and the Trustee, CityPlace's own expert—Mr. Chiasson—conceded than an appraiser must examine the market and determine if the proposed zoning change had an impact on current market values.

In sum, the Court holds that, under USPAP and FIRREA, "if there is a pending zoning application, an appraiser must analyze the effect of the zoning application on the market value of the property." Because Mr. Walsh's appraisal did not consider the zoning modification sought by CityPlace, the appraisal fails to comply with USPAP and FIRREA and is therefore invalid under Section 4.9(g) of the Loan Modification Agreement.[14]  That appraisal therefore may not serve as a basis for determining Appraised Value.

**D.     Fourth Basis for the Court's Judgment – CityPlace Breached its Duty of Good Faith and Fair Dealing**

In connection with the Court's third basis for judgment outlined above, the Court holds that CityPlace's appraisal is void because CityPlace breached its duty of good faith and fair dealing when it withheld the existence of the zoning application and its dealings with the City of West Palm Beach from Mr. Walsh.  This breach was compounded by CityPlace's disclosure of the application to Alliance Bernstein, as well as prospective retail tenants whom CityPlace was soliciting for business. The Court also holds that CityPlace breached its duty of good faith and fair dealing through its conduct in the appraisal process.

New York law has long recognized that implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance.  *Dalton v. Educational Testing Services*, 87

---

[14] The Court's ruling is in no way intended to imply that Mr. Walsh's appraisal had to assign value to the zoning change application or that he had to conclude that the zoning change was reasonably probable—those types of determinations typically belong to appraisers, not courts of law.  Indeed, it is Mr. Walsh's testimony that even if he had known about the application, he would not have altered his appraised value.  The Court does not rule that USPAP or FIRREA required Mr. Walsh to alter his calculations; the Court's ruling is limited to the fact that USPAP and FIRREA required Mr. Walsh to *consider* something and, due to CityPlace's withholding of information from Mr. Walsh, Mr. Walsh did not consider what he was required to consider.  Thus, Mr. Walsh's appraisal did not comply with USPAP and FIRREA.

N.Y.2d 384, 389 (1995).  This covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *ABN AMRO Bank, N.V. v. MBIA Inc.*, 17 N.Y.3d 208, 228 (2011).  "While the duties of good faith and fair dealing do not imply obligations inconsistent with other terms of the contractual relationship, they do encompass any promises which a reasonable person in the position of the promissee would be justified in understanding were included." *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002) (quotation marks and citations omitted)).

The duty of good faith and fair dealing "is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." *Frankini v. Landmark Construction of Yonkers, Inc.*, 937 N.Y.S.2d 80, 83 (App. Div. 2012).  Under New York law, even if a party abides by the express terms of a contract, it may breach its duty to act in good faith when it acts to deny the other party the fruits of a contract with respect to the proper valuation of property. By way of example, shares under a Long Term Incentive Plan ("LTIP") agreement needed to be valued in *Fishoff v. Coty, Inc.*, 634 F.3d 647, 653 (2d Cir. 2011).  The plaintiff in *Fishoff* was awarded certain options, and pursuant to the LTIP agreement, despite the discretion vested in the board, once an optionee made a valid exercise, Coty was required to make payment based upon the fair market value of the company's shares on the date the option was exercised.  *Id*. at 654. The Coty board, however, adopted a special retroactive valuation solely for Fishoff's shares, which the Second Circuit held was a "clear violation of the duty of good faith and fair dealing; Coty's actions plainly denied [the plaintiff] the fruits of the contract."  *Id*. at 653; *accord Forman v. Guardian Life Insurance Co. of America*, 76 A.D.3d 886, 888 (N.Y. 2010).

New York courts have held that the implied duty of good faith and fair dealing can be

breached even if there were no breach of an express contractual term:

> A reasonable person would understand the Valuation Matrix to include true business that reflects the future value of the company, not one-time deals made to create the illusion of prosperity. If defendants' allegations were true, the Cohen Contracts were nothing more than a sham to make the business appear more valuable than it was. DSM2x's argument that defendants made a substantial sum of money on the Cohen Contracts is inapposite. Indeed, defendants were purportedly net losers on the Cohen Contracts because more money would have been remitted back to DSM2x than defendants received when the Valuation Matrix's multiplier is taken into account. That being said, the viability of this claim turns on the question of fact as to whether the Cohen Contracts were part of a kick-back scheme or whether they were merely the product of good faith referrals.

*DSM2x, Inc. v. GFK Custom Research, LLC*, No. 650008/2012, 2013 WL 2402752, at *2-5

(Sup. Ct. May 29, 2013).

The evidence establishes that, in the months leading up to the refinance, CityPlace knew

that its zoning application was likely to be approved and that CityPlace promoted the apartment

building project to both its new lender and prospective retail tenants. Yet, despite CityPlace's

expectation that the zoning application would be approved and its promotion of the Macy's project

to third parties, CityPlace did not disclose it to Mr. Walsh. The evidence also shows that CityPlace

undertook other actions to try to artificially depress Mr. Walsh's valuation.

On August 17, 2018, Jordan Rathlev told Alliance Bernstein and Eastdil about CityPlace's

plans for the Macy's site. Specifically, Mr. Rathlev informed Alliance Bernstein and Eastdil that

a 300-unit residential tower was planned for the Macy's site, without expressing reservations that

the project was contingent on approval of the rezoning application.

In July 2018, CityPlace distributed marketing materials to potential retail tenants that

discussed the residential tower to be built on the Macy's site. In order to induce businesses to sign

leases for the Property, CityPlace promoted that the future residential tower would capitalize on an expanding population and commercial growth.

In early 2017, CityPlace prepared a pre-development budget for the apartment building project, maintaining it on a monthly basis. By the end of August 2018, CityPlace had expended $8,613,577.35 on the project. That investment increased to $8,916,438.65 by October 2018. Further, at that time, more than two months before the City of West Palm Beach approved the zoning application, CityPlace projected a groundbreaking for the 21-story building to occur in October 2019.

By October 2, 2018, 10 days before Mr. Walsh's appraisal was completed, CityPlace and the Planning Department of the City of West Palm Beach reached an agreement on all material issues related to the zoning application. Armando Fana, Director of the Department of Housing and Community Development, emailed Mr. Rathlev to tell him that there was an agreement on the affordable work force housing issue and that his department would recommend approval of the zoning application.

Despite CityPlace's expectation that a zoning change was probable, and its knowledge no later than October 2, 2018 that all issues with the City of West Palm Beach had been resolved, CityPlace did not disclose the existence of the zoning application to its appraiser Mr. Walsh. Indeed when CityPlace reviewed Mr. Walsh's draft, CityPlace saw the false statements regarding zoning, but stated "no comment".

CityPlace's failure to disclosure the zoning application to Mr. Walsh[15] constituted a breach of CityPlace's implied duty of good faith and fair dealing in the course of performing its obligations under the Loan Modification Agreement.[16]

---

[15] Evidence at trial also established that CityPlace failed to disclose the plans for Macy's to Mr. Lieberman when Mr. Lieberman was preparing the TIF appraisal, shortly before the events surrounding the refinancing.

[16] This breach is further confirmed by Mr. Chiasson's testimony that the definition of market value under FIRREA

Aware that a high valuation would trigger payments under the Loan Modification Agreement, CityPlace influenced Mr. Walsh's choice of the discount rate utilized in his appraisal in order to cap the valuation at approximately $120 million. On October 3, 2010, Mr. Walsh returned a preliminary valuation of $129 million, using an 8.25% discount rate and a 7.25% terminal cap rate. Mr. Rathlev asked Mr. Walsh to apply an 8.5% discount rate and a 7.5% terminal cap rate, for a $110 million valuation, and later told Mr. Walsh that, after the projected income was reduced, CityPlace would be comfortable with using an 8.0% discount rate and 7.0% terminal cap rate for a $120 million valuation. And when the income thereafter increased, in order to offset the increase valuation that this change would effect, CityPlace encouraged use of higher rates. CityPlace knew that, by increasing the discount rate and the terminal cap rate, the valuation of the Property would be decreased. In his final draft of the appraisal, Mr. Walsh provided a valuation of $120 million using a discount rate of 8.75%.

CityPlace provided Mr. Becker information that would drive the value up (such as the information in the Eastdil report and favorable comparable sales data), at the same time that it did not disclose information to Mr. Walsh. Accordingly, the Court holds that CityPlace breached its duty to act in good faith under the Loan Modification Agreement.

## E.    Attorney's Fees

The parties, in their respective proposed orders, have argued the issue of entitlement to attorney's fees. This was not a matter addressed or argued at trial, nor was this matter previously argued in any motion practice before the Court. The Court defers this matter for the parties to file, if necessary, a motion for attorney's fees consistent with the rulings herein.

---

does not permit a property owner, such as CityPlace, to conceal and not disclose information necessary to ensure that the buyer and seller are both well-informed. 10/31 Tr. at 82:3-25, 84:4-18.

## IV.    RULING

For the reasons discussed above, the Court grants the following relief.  On CityPlace's claims for declaratory relief, the Court enters judgment in favor of the Trustee dismissing CityPlace's remaining claims with prejudice.

On the Trustee's counterclaim for declaratory relief, the Court enters judgment in favor of the Trustee insofar as the Court enters a declaration that:  (1) CityPlace's appraisal is void under the terms of the Loan Modification Agreement; (2) the parties are directed to begin anew the appraisal process under Section 4.9(g)(i) of the Loan Modification Agreement; and (3) the MAI appraisals conducted under Section 4.9(g)(i) must utilize an effective date after September 7, 2018 and earlier than December 11, 2018.  At a minimum, the MAI appraisal must **consider** the CityPlace zoning change application on market value, even if the appraisal assigns no market value to the same.  The Trustee shall submit a proposed final judgment in Microsoft Word format to rosenberg@flsd.uscourts.gov within four business days of the date of rendition of this Order, after conferral with CityPlace on the wording of the same.  The Clerk of the Court shall **CLOSE THIS CASE**.

**DONE AND ORDERED** in Chambers, West Palm Beach, Florida, this 30th day of April, 2020.

Robin L. Rosenberg
United States District Judge

Copies furnished to all counsel of record.